# In the United States Court of Federal Claims

No. 24-207
(Filed Under Seal: December 2, 2024)
Reissued: December 19, 2024[1]

|   |   |
|---|---|
| CHUGACH RANGE AND FACILITIES SERVICES JV, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant, | ) ) |
| and | ) ) |
| AKIMA FACILITIES OPERATIONS, LLC, | ) ) ) ) |
| Defendant-Intervenor. | ) ) |

*Douglas L. Patin*, Bradley Arant Boult Cummings LLP, Washington, D.C., for plaintiff.

*James W. Poirier*, U.S. Department of Justice, Civil Division, Washington, D.C., for defendant.

*C. Peter Dungan*, Miles & Stockbridge, PC, Washington, D.C., for defendant-intervenor.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Chugach Range and Facilities Services JV, LLC ("Chugach"), challenges the award of Contract No. W9124P-2-C-0012 (the "Contract") to defendant-intervenor, Akima Facilities Operations, LLC ("Akima"), by the U.S. Department of the Army Contracting Command – Redstone Arsenal (the "Army" or "Agency") for Installation Support Services ("ISS") issued under Request for Proposals No. W9124P-20-R-0007 (the "Solicitation"). *See* Plaintiff's Second Amended Compliant at 1–3, ECF No. 74 [hereinafter Am.

---

[1] An unredacted version of this opinion was issued under seal on December 2, 2024. The parties responded to the Court's call for redactions, and this decision reflects the Court's ruling on plaintiff's proposed redactions.

Compl.]; *see also* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 60 [hereinafter Pl.'s MJAR].  Chugach is a joint venture between Chugach Consolidated Solutions, LLC, and Wolf Creek Federal Services, Inc. ("Wolf Creek").  AR 1484–86.  Wolf Creek was the incumbent contractor for the ISS contract at the Redstone Arsenal for roughly ten years.  AR 1490.

In the current procurement, Chugach mainly argues that the Agency engaged in misleading discussions, causing Chugach to revise its proposal in such a way that its final proposal became ineligible for award.  *Id.* at 12–19.  Chugach makes a handful of other arguments, all related to the Agency's purported irrational evaluation of proposals throughout the procurement.  *See id.* at 12–36.  In response, defendant, the United States, argues that the Agency treated Chugach fairly during discussions and evaluated the proposals reasonably, including its determination that Chugach's proposal was ineligible for award because Chugach proposed a different scope of work than that stated in the Solicitation.  Defendant's Cross-Motion for Judgment on the Administrative Record at 28–37 [hereinafter Def.'s CMJAR].

For the reasons set forth below, the Court grants defendant and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record and denies plaintiff's Motion for Judgment on the Administrative Record.

**I.      Background**

History seldom repeats itself, but it often rhymes.  The factual background of this procurement sounds like many others—full of solicitation amendments, multiple rounds of proposal revisions, and several protests before the U.S. Government Accountability Office ("GAO").  Rather than repeat the history of this procurement in full, the Court only draws out the facts relevant to the instant protest.

**A.      The Solicitation**

On July 31, 2020, the Agency issued the Solicitation for Installation Support Services for the U.S. Army Garrison-Redstone located on the Redstone Arsenal in Northern Alabama.  Administrative Record 138, ECF Nos. 38–48 [hereinafter AR].  The Agency "provides a wide range of Installation Support Services (ISS) that represent an estimated 30,000 service calls per year to the estimated 20,000 facilities on Redstone Arsenal."  *Id.*  The Solicitation sought to procure recurring support services, like facilities maintenance, HVAC services, landfill operations, and pavement clearance operations, among others, to support exponential growth at the Redstone Arsenal.  *Id.*  The Agency issued the Solicitation as a total set-aside under the Small Business Administration's 8(a) program.  AR 11186.  The Solicitation contemplated a ten-year period of performance consisting of a one-year base period and nine one-year option periods.  *Id.*; *see also* AR 14129.  In total, the Agency amended the Solicitation nine times, *see* AR 931, 1116, 1259, 1398, 1400, 1402, 11009, 13875, 14228, with the most relevant and substantial changes in Solicitation Amendment 0007, *see* AR 11009, which embodied the

Agency's corrective action following a GAO protest. The following discussion summarizes the Solicitation related to Amendments 0007–0009.

### i. Solicitation Instructions

The Solicitation required offerors to submit proposals comprised of three factors: Factor 1 – Specialized Experience; Factor 2 – Technical Approach; and Factor 3 – Price. AR 14120–36. Factor 1 – Specialized Experience is not at issue in this protest. Factor 2 – Technical Approach contained three subfactors: Subfactor 1: Technical Suitability; Subfactor 2: Preventative Maintenance; and Subfactor 3: Management Capability. AR 14123. Subfactor 3 (Management Capability) is not at issue in this protest, but both Subfactor 2 (Preventative Maintenance) and Subfactor 1 (Technical Suitability) are.

For Subfactor 1: Technical Suitability, the Solicitation required offerors to submit staffing plans for handling urgent and critical engineering services called "Demand Maintenance Orders," which required rapid responses, ranging from one hour to the next day by noon. AR 337–38. Also, for Subfactor 1, the Solicitation stated that offerors must "provide a narrative for the rationale and justification for how the staffing plan was developed" and that "[a]ll staffing efficiencies and cost benefits for the staffing plan shall be fully explained . . . ." AR 11181. Offerors were also required to have 35 dedicated employees at 22 sites for Subfactor 1. AR 363; AR 456; AR 13761; AR 13809.

For Subfactor 2: Preventative Maintenance, the Solicitation required offerors to submit plans for handling the more prescheduled and less urgent "Preventative Maintenance Orders," which required responses ranging from five to thirty days. AR 340. Also, for Subfactor 2, the Solicitation informed offerors that the historical preventative maintenance data it provided was estimated to be around 70% of the level of effort required for this contract. AR 1430, 1441. The Solicitation also identified several requirements for offerors' plans for meeting the Preventative Maintenance requirements in the Solicitation, such as describing and justifying Preventative Maintenance staffing assets and equipment, how offerors will manage preventative maintenance orders, and how offerors' Preventative Maintenance plans will affect total program performance, with specific reference to the demand maintenance program. AR 11182. The Solicitation also stated that the Preventative Maintenance plan must be "completed and fully operational . . . no later than 90 days after contract start date." AR 341.

For both Subfactors 1 and 2, the Solicitation cautioned offerors to support claims in their proposals with "sufficient details to permit a complete and accurate evaluation of each proposal" because unsupported "[s]tatements that the offeror understands, can, or will comply with the [Performance Work Statement] and phrases such as . . . 'well know[n] techniques will be used' . . . will be considered unacceptable." AR 670.

### ii. Solicitation Evaluation Criteria

The Solicitation stated that the Agency would select the source that provided the best value in accordance with Federal Acquisition Regulation ("FAR") 15.3. AR 14136. "The best value is defined as: 1.) The Offeror who achieves a rating of 'high confidence' in the Specialized Experience factor, and 2.) Provides the best value to the Government based upon a tradeoff evaluation assessment between the Technical Approach and Cost/Price factors." *Id.*

The Solicitation provided extensive detail as to how the Agency would evaluate the technical factors and subfactors. *See* AR 11218–22 (amendment adding three additional pages of evaluation criteria/methodology). In accordance with the Army Source Selection Supplement, the Agency employed a Combined Technical/Risk Rating to evaluate the "risk, in conjunction with the strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies in determining technical ratings." AR 11222. The Combined Technical/Risk Rating consisted of a five-level adjectival scale to rate technical proposals:

| Color | Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is un-awardable. |

TABLE 2 – COMBINED TECHNICAL/RISK RATINGS

*Id.* The Solicitation also stated that proposals must receive a final rating of no less than "Acceptable" for technical factors and sub-factors to be eligible for award. AR 684, 14137.

Finally, the Solicitation cautioned offerors on two points. First, it noted the interplay between technical factors and price, which favored technical factors over price and signaled to offerors that "the award may not be made to the lowest price offered." AR 14136. Second, it advised offerors that the Agency reserved the right to conduct discussions:

> After evaluation of each Offeror's Technical Approach and Cost/Price proposals, award will be made to the Offeror that represents the best value to the Government without entering into discussions, however, if the Contracting Officer determines that discussions are needed, discussions will be conducted with Offerors whose proposals have been determined (based on evaluations) to be within the competitive range.

> Therefore, the Offeror's initial proposal should contain the Offeror's best terms from a price and technical standpoint. Offerors may be asked to clarify certain aspects of their proposal or similar minor exchanges conducted with regard to minor or clerical errors. These type exchanges will not constitute discussions, and the Government reserves the right to award a contract without the opportunity for proposal revisions.

AR 11216–15 (highlighting in original).

### iii. Solicitation Amendment

After the Agency's first evaluations of offerors' proposals based on the above solicitation evaluation criteria, Chugach protested to the GAO, arguing that the Agency irrationally evaluated Chugach's proposal when it determined that the proposal was deficient because of insufficient staffing. AR 5716–20. Subsequently, the Agency took voluntary corrective action and amended the Solicitation to clarify the technical requirements under Factor 2 (Technical Approach); and provided that the Agency's evaluation criteria would include a cost realism analysis under Factor 3 (Price). *See* AR 10978, 10985–11008. On July 5, 2022, the Agency issued the Solicitation Amendment with revised proposals due by August 15, 2022. AR 11009–12650.

## B. The Agency's Evaluation

### i. Chugach's Revised Proposal

Chugach timely submitted a corrective action revised proposal ("Revised Proposal"). AR 12651–969. For Subfactor 1, Technical Suitability, Chugach proposed a ███% reduction in Demand Maintenance Order staffing hours compared to historical levels. AR 13692–96. Chugach stated that its reduced Preventative Maintenance staffing plan is the reason for this reduction. AR 14536. Chugach's proposal also stated that this conforms to commercial parameters. AR 13714. Lastly, Chugach explained that its staffing reduction is also due to its "███ program" which reduces indirect time with its "highly detailed business policies" that "incorporate[] lessons learned" for "best practices recognized from other applicable industry segments." AR 13716–18; AR 14536.

For Subfactor 2, Preventative Maintenance, Chugach proposed an alternate Preventative Maintenance plan where Chugach would determine which assets are critical after contract award and provide a "less aggressive maintenance plan" for assets it determines to be not critical. AR 13730; AR 14535.

For Chugach's price, Chugach proposed a base year price that was much higher than the prices of the option years because Chugach planned to utilize its partner, ███████, for

its Preventative Maintenance program during the base year, but not during the option years. AR 13840–41.

### ii.  Initial Technical Evaluation

The Technical Evaluation Team ("TET") conducted an initial technical evaluation of Chugach's Revised Proposal and gave Chugach an overall rating of "Unacceptable" for proposing a scope of work different from that in the Solicitation. AR 13686. For Subfactor 1, Technical Suitability, the TET stated that Chugach's large reductions in staffing for Demand Maintenance Orders created a high risk of unsuccessful performance. AR 13692–96; AR 13702–27. The TET found Chugach's rationale for its proposed reduction in staffing to be vague and unsubstantiated because of the lack of KPI parameters, industry benchmarks, RSA metrics, and other supporting evidence. AR 13692–96; AR 13702–27. Although Chugach's proposal had stated that it "conforms to commercial parameters," the TET was not convinced that Chugach would be able to meet the Redstone Arsenal Installation Support Services requirements. AR 13714. According to the TET, the Redstone Arsenal differs greatly from commercial services in that its facilities have "a broad range of equipment and components that vary in age, type, and manufacturer" while commercial services have standardized components "of similar utility, make, and age." *Id.*

The TET similarly stated that Chugach's proposal did not provide data or evidence to show how Chugach's "▮▮▮▮▮" program would work to reduce time and staffing. AR 13716–18; AR 14536. The TET stated that Chugach's explanation that its ▮▮▮▮▮ program has "highly detailed business policies" that "incorporate[] lessons learned" for "best practices recognized from other applicable industry segments" is too vague to meet solicitation requirements. *Id.* The TET reminded Chugach of the Solicitation instructions that "[s]tatements that the Offeror understands, can, or will comply with the [Performance Work Statement] and phrases such as 'standard procedures will be employed' or 'well known techniques will be used' etc. will be considered unacceptable" when stating that Chugach's attempted explanation for its proposed staffing with ▮▮▮▮▮ was unacceptable. *Id.*

The TET also stated that, for Subfactor 2, Preventative Maintenance, Chugach ignored the Solicitation's description of the required Preventative Maintenance plan and instead proposed an alternate Preventative Maintenance plan where Chugach would determine which assets are critical after contract award and provide a "less aggressive maintenance plan" for assets it determines to be not critical. AR 13730. The TET cautioned that Chugach's alternate plan, which "will leave multiple assets unmaintained," represents a "material" and "complete failure to even attempt to meet" the already determined requirements of the Preventative Maintenance as described in the Performance Work Statement in the Solicitation. *Id.*

### iii. Agency Discussions

On May 9, 2023, the Agency held discussions with each offeror by sending Evaluation Notices ("ENs") that highlighted the weaknesses and deficiencies of the proposals to allow the offerors to improve their final proposals. AR 13759–772; AR 13841; AR 16380; AR 16384; AR 25689.

The Agency sent Chugach four ENs regarding Subfactor 1 and two ENs regarding Subfactor 2 alerting Chugach of various unacceptable reductions to the scope of work. AR 13759–72. For Subfactor 1, the first EN notified Chugach of its failure to meet the requirement of 35 dedicated employees at 22 sites, and Chugach promised to correct this in its final proposal. AR 13761; AR 13809. The second EN notified Chugach that its staffing plan was a significant weakness because it contained vague claims with no supporting data or evidence; did not explain how efficiencies were applied; and did not explain how technical exhibits were used in developing the staffing plan. AR 13762–64. The Agency gave Chugach an opportunity to revise these sections in its final proposal. AR 13764. Chugach's response to the Agency's concerns regarding its staffing was that its proposal "provides what we believe is a sound rationale and justification of our staffing approach." AR 13812–13.

In the third EN for Subfactor 1, the Agency notified Chugach that its proposed ▮% reduction in Demand Maintenance Order staffing and the additional reductions in the option years was a significant weakness, and invited Chugach to correct this in its final proposal. AR 13765–66. Chugach replied that "[w]e perceive the Government's staffing plan to be based on outdated facility management approaches that fail to account for industry best practices" and stated that "[w]e are not adjusting our labor solution." AR 13816. Chugach also stated that its proposed reduction for Demand Maintenance Order staffing is because of its Preventative Maintenance plan where fewer assets will fail, thereby requiring less reactive maintenance. AR 14536.

Lastly, the fourth EN for Subfactor 1 notified Chugach that the staffing reductions it proposed in option years is a weakness because the efficiencies Chugach uses to support the reductions are not adequately described. AR 13767–68. Chugach responded that the descriptions in its proposal were already appropriate and convincing. AR 13818.

For Subfactor 2, the first EN notified Chugach that its alternate Preventative Maintenance plan of making its own criticality determinations after contract award is a deficiency because it fails to explain how the plan was developed, given its undefined scope, and because it fails to explain how the non-critical assets will receive preventative maintenance. AR 13769–70. The Agency invited Chugach to correct this, and Chugach responded with a defense of its alternate plan. AR 13821. The second and last EN for Subfactor 2 informed Chugach that its lack of explanation and supporting data for its staffing plan for Preventative Maintenance activities was a significant weakness. AR 13771–72. Chugach responded that its narrative was "a sound rationale." AR 13824.

For Subfactor 3, price, the Agency, informed Chugach:

> "A price analysis was performed on the proposed price. While your overall proposed price appears reasonable, the base year price for CLIN X003 appears overstated, when compared to the option years, which is an indicator of unbalanced pricing [. . . .] Please provide supporting documentation to show that the proposed CLIN X003 price is balanced."

AR 13840. Chugach responded that its price was balanced because it planned to use its partner, ▬▬▬▬▬▬▬▬▬, during the base year, which had a higher price, but not during the option years, which had lower prices. AR 13841.

For every response Chugach gave after the Agency informed it of every weakness in its proposal, the Agency stated that "your response appears acceptable *provided* the data discussed in your EN response is included/updated in your Final Proposal Revision," and Chugach stated that it understood. AR 13809; AR 13813; AR 13816; AR 13818; AR 13824; AR 13841 (emphasis added).

### iv.   Final Proposal Revisions and Award to Akima

On May 18, 2023, the Agency issued amendment 8 to the Solicitation, which contained updated labor cost information to be used in offerors' final proposals. AR 13875–76. The Agency subsequently issued amendment 9 on May 25, 2023, which required final proposals to be submitted by May 30, 2023. AR 14228–29.

Chugach corrected the deficiency stated in the first EN for Subfactor 1 by including in its final proposal the mandatory staffing requirement of 35 dedicated employees at 22 sites. AR 14541–48. The Agency increased Chugach's rating for Subfactor 1 from "Unacceptable" to "Marginal." AR 16081. However, Chugach did not include in its final proposal an updated rationale and justification for its Demand Maintenance Order staffing plan, and the Agency found this to be a significant weakness. AR 16093–96. The Agency similarly rated Chugach's Subfactor 2, Preventative Maintenance, as "Unacceptable" because Chugach did not correct or update its alternate Preventative Maintenance plan that, in opposition to the Solicitation's requirements, involved making criticality determinations for assets after contract award. AR 16081; AR 16096; AR 16098. The Agency likewise found Chugach's staffing plan for Preventative Maintenance vague with no supporting data, and gave Chugach's technical proposal, Factor 2, an overall rating of "Unacceptable." AR 16081–93; AR 16097.

For factor 3, price, Chugach did not provide supporting documentation in its final proposal as requested by the agency. AR 16384. The Agency explained that Chugach's proposed price remained unresolved because the Agency could not determine whether its proposed price was balanced without "additional information." *Id.*

On September 19, 2023, the Agency selected Akima for award.  AR 16695–714.

### C.    Procedural History

Prior to the instant case, Chugach protested the issuance of the award to Akima at the GAO.  On January 11, 2022, Chugach challenged the Agency's evaluation of its Demand Maintenance Order staffing as unreasonable.  AR 5965–6137.  On March 15, 2022, following outcome prediction, the Agency elected to take corrective action, and the GAO dismissed the protest as academic.  AR 10980.  On October 10, 2023, Chugach filed another protest challenging the Agency's evaluation of proposals by claiming that the deficiencies it received were unreasonable, and that the Agency used unstated evaluation criteria.  AR 17061–9033; AR 25690–92.  On January 10, 2024, the GAO denied Chugach's protest on the merits.  AR 25686–703.

On February 12, 2024, plaintiff filed its Complaint with this Court seeking a finding in its favor, a permanent injunction, revised proposals, and a new award decision.  *See* Compl.  On February 15, 2024, plaintiff moved for a preliminary injunction seeking a stay of contract performance.  *See* Plaintiff's Motion for Preliminary Injunction, ECF No. 11.  On February 27, 2024, defendant and defendant-intervenor filed responses to plaintiff's Motion for a Preliminary Injunction.  *See* Defendant's Response to Plaintiff's Motion for Preliminary Injunction, ECF No. 33; Defendant-Intervenor's Response to Plaintiff's Motion for Preliminary Injunction, ECF No. 31.  On February 29, 2024, plaintiff filed its reply in support of its Motion.  Plaintiff's Reply, ECF No. 36.  On March 6, 2024, the Court held oral argument on plaintiff's Motion.  Pursuant to discussions held during that argument, the Court denied plaintiff's Motion.  March 6, 2024 Order, ECF No. 51.  The Court moved to briefing on the merits.[2]

In March 2024, defendant filed the Administrative Record.  Administrative Record, ECF Nos. 38–49 [hereinafter AR].  On April 9, 2024, plaintiff filed its Motion for Judgment on the Administrative Record ("Motion").  Pl.'s MJAR, ECF No. 60.  On April 25, 2024, plaintiff moved, unopposed, to amend its Complaint, which it filed on April 30, 2024, following the Court's leave.  Plaintiff's Motion to Amend Complaint, ECF No. 61; Apr. 30, 2024 Order, ECF No. 63; Plaintiff's Amended Complaint, ECF No. 65.  On May 15, 2024, defendant and defendant-intervenor filed their Responses and Cross-Motions for Judgment on the Administrative Record (collectively, "Cross-Motions").  Def.'s CMJAR, ECF No. 67; Defendant-Intervenor's Response and Cross-Motion for Judgment on the Administrative Record, ECF No. 68 [hereinafter Def.-Int.'s CMJAR].  On May 20, 2024, plaintiff filed its reply in support of its Motion and its Response to the Cross-Motions.  Plaintiff's Reply, ECF No. 69.  On May 28, 2024, defendant and defendant-intervenor filed their replies.  Defendant's Reply, ECF

---

[2]     On February 27, 2024, the Court issued an initial scheduling order to conclude briefing at the end of April.  *See* Scheduling Order, ECF No. 32.  Upon the parties' requests, the Court extended the briefing schedule to the beginning of June 2024.  *See*, *e.g.*, Defendant's Motion to Amend Schedule, ECF No. 34; Defendant's Second Motion to Amend Schedule, ECF No. 37; Plaintiff's Motion to Amend Schedule, ECF No. 56; Defendant's Third Motion to Amend Schedule, ECF No. 62.

No. 70; Defendant-Intervenor's Reply, ECF No. 72.  That same day, plaintiff moved, unopposed, for a second time to amend its complaint, which it filed following the Court's leave.  Plaintiff's Second Motion to Amend Complaint, ECF No. 71; May 28, 2024 Order, ECF No. 73; Plaintiff's Second Amended Complaint, ECF No. 74.  On June 6, 2024, the parties filed a joint appendix.  Joint Appendix, ECF No. 75.  On July 16, 2024, the Court held oral argument.

## II.     Standard of Review

The Tucker Act grants this Court jurisdiction over bid protest actions.  28 U.S.C. § 1491(b)(1).  This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions, which may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706 by reference); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The Court will "interfere with the government procurement process 'only in extremely limited circumstances,'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)), and it will not substitute its judgment for that of the agency, *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

"[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (collecting cases).  In either case, "the protestor bears the heavy burden of proving the lack of a rational basis or a violation of law by a preponderance of the evidence."  *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 735 (2007).  Under the first part, the Court recognizes that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Id.* (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  The test for courts is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Id.* at 1332–33 (internal citation omitted).  If "the court finds a reasonable basis for [an] agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted).

When a challenge is brought under the second part, the protestor must show that the alleged violation was a "clear and prejudicial violation of applicable statutes or regulations."  *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1333 (citation omitted).  Therefore, if the agency's procurement decision lacked a rational basis or is contrary to law, the court will then "determine, as a factual matter, if the bid protester was prejudiced by that conduct."  *Bannum, Inc.*, 404 F.3d at 1351; *see also Sys. Stud. & Simulation v. United States*, 22 F.4th 994, 996–98 (Fed. Cir. 2021).  A protestor must show prejudice by showing that it had a substantial chance of receiving the award but for the agency's errors.  *Bannum, Inc.*, 404 F.3d at 1353.

A party may file a motion for judgment on the administrative record requesting that the Court assess "whether the administrative body, given all disputed and undisputed facts appearing

in the record, acted in a manner that complied with the legal standards governing the decision under review" pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). On such a motion, the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record. R. Ct. Fed. Cl. 52.1; *Bannum, Inc.*, 404 F.3d at 1354. The Court will then determine whether the moving party has met its burden of proof based on the evidence in the record. *Bannum, Inc.*, 404 F.3d at 1355.

## III. Discussion

The issues presented before the Court are whether the Agency mislead Chugach during discussions and whether the Agency reasonably evaluated Chugach's proposal. Each issue is addressed, in turn, below.[3]

### A. The Agency Did Not Mislead Chugach During Discussions.

Agencies must tailor discussions to each offeror's proposal, and "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. (Federal Acquisition Regulation or "FAR") § 15.306(d)(3). Discussions must include this information "so that the offerors have a reasonable opportunity to address those areas of weakness which could have a competitive impact." *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 124, 131 (2000) (internal citations omitted).

Additionally, agencies may not mislead offerors during discussions because doing so would favor one offeror over another. *See Raytheon Co. v. United States*, 809 F.3d 590, 594–96 (Fed. Cir. 2015). Discussions are misleading where the agency misdirects or misinforms an offeror about its proposal, such as by failing to inform the offeror of the agency's concerns regarding a weakness or deficiency, falsely assuring the offeror that a weakness or deficiency has been resolved when it has not been resolved, or informing the offeror of a weakness or deficiency that does not exist. *See Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017); *see also Caddell Construction Company v. United States*, 125 Fed. Cl. 30, 45 (2016) (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 369 (2009); *DMS All–Star Joint Venture v. United States*, 90 Fed. Cl. 653, 671 (2010); *D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40–41 (2011), aff'd, 484 Fed. Appx. 558 (Fed. Cir. 2012).

Chugach argues that the Agency conducted misleading discussions with Chugach regarding the weaknesses in its technical proposal. Pl.'s MJAR at 12–15. Specifically, Chugach argues that the Agency misled Chugach when the Agency informed Chugach of its weaknesses

---

[3] Chugach also made other arguments regarding the Agency's price/cost evaluation and the Agency's evaluation of Akima's proposal, and requested a permanent injunction. *See generally* Pl.'s MJAR at 20–30, 37–40. After careful consideration, the Court finds these arguments without merit.

during discussions, Chugach responded that it understood, and the Agency found these responses to be "acceptable," but then later found Chugach's proposal to be deficient. *Id.*; AR 13816; AR 13821; AR 13824; AR 13840.

Chugach also argues that the Agency misled it during discussions of its price when the Agency told Chugach it needed "supporting documentation" to explain how its prices are balanced but then later unfavorably evaluated Chugach's price for a lack of "additional information." Pl.'s MJAR at 15–20; AR 16380; AR 13841; AR 16384. Chugach argues that "additional information" is different from "supporting documentation," so it had no reason to know it needed "additional information." Pl.'s MJAR at 15–20.

The Agency disagrees, arguing that it clearly told Chugach during discussions that Chugach needed to correct the issues in its technical proposal: "You appear to understand the EN issue as discussed, therefore, your response appears acceptable provided the data discussed in your EN response is included/updated in your Final Proposal Revision." Def.'s CMJAR at 31–35, ECF No. 67; AR 13816; 13821; AR 13824; AR 13840. The Agency does not address how its discussions regarding Chugach's price were reasonable. *Id.*

The Court finds that the discussions were not misleading because the Agency never approved of Chugach not correcting any of the issues the Agency raised during discussions. If Chugach interpreted "your response appears acceptable provided the data discussed in your EN response is included/updated in your Final Proposal Revision" to mean it did not have to fix its issues, it misread the Agency's clear communication informing Chugach that it needed to correct its weaknesses and deficiencies. AR 13816–18; AR 13841. The Agency was clear that Chugach had to make corrections to improve its rating when it said that Chugach's responses were acceptable "*provided* the data discussed in your EN response is included/updated in your Final Proposal Revision." AR 13816–18; AR 13841 (emphasis added). The use of the word "provided" is a caveat, and the Agency's statement can be rephrased as: Chugach's response is acceptable *if* the appropriate changes are made to its final proposal. AR 13816–18; AR 13841. The Agency did not withhold any weaknesses or deficiencies from Chugach, falsely assure Chugach that a problem had been resolved, or otherwise misinform Chugach.

Chugach's argument that the Agency misled it when the Agency told it to provide "supporting documentation" to explain its balanced pricing during discussions but then later rejected its final proposal for a lack of "additional information" to explain its balanced pricing likewise fails. There is no material difference here between a need to provide "supporting documentation" and a need to provide "additional information." Indeed, the Agency's request for "supporting documentation" to help explain how Chugach's pricing was balanced necessarily requires Chugach to provide "additional information" because what Chugach had already submitted was insufficient. Additional material was therefore required and clear from the Agency's request.

**B. The Agency Reasonably Evaluated Chugach's Proposal.**

**i. The Agency Reasonably Evaluated Chugach's Technical Proposal.**

Agencies are given a great deal of deference when determining their needs, and such needs are "not for [the] court to second guess." *Savantage Financial Services, Inc. v. U.S.*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004)). Additionally, an agency "must follow the terms of [its] solicitation when awarding a contract." *Assessment and Training Solutions Consulting Corporation v. United States*, 173 Fed. Cl. 123, 127 (2024) (quoting *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 397 (2021). Additionally, in negotiated procurements, offerors' proposals must comply with the material requirements of the Solicitation, and proposals that fail to do so must be rejected. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (citations omitted); *Tin Mills Props., LLC v. United States*, 82 Fed. Cl. 584, 591 (2008).[4] The Court concludes that the Agency comfortably met these legal standards.

**Technical Approach Subfactor 1 (Technical Suitability):** Chugach argues that its "Marginal" rating for Subfactor 1, Technical Suitability, was unreasonable because the Agency deviated from the terms of the Solicitation. Pl.'s MJAR at 33. Specifically, Chugach argues that it adequately justified its proposed reduction in Demand Maintenance Order staffing compared to historical levels when it stated that, because of its Preventative Maintenance plan, implemented by its "industry expert" partner, ▆▆▆▆▆▆▆▆▆▆, fewer assets will fail, thereby requiring less reactive maintenance. *Id.* at 33–35. The Agency argues that Chugach's explanation did not adequately justify the proposed staff reduction because it did not adequately describe or explain its Preventative Maintenance plan, which was "undefined," as it would not have been developed until after contract award. Def.'s CMJAR at 28–29. The Agency also argues that Chugach's Demand Maintenance Order staffing program, ▆▆▆▆▆, is vague and unsupported. *Id.* at 29.

The Agency followed the terms of the Solicitation, and Chugach did not. The Solicitation warned offerors that the project under this contract would require *more* staffing compared to historical levels, but Chugach proposed *less* staffing compared to historical levels. This is the opposite of what the Solicitation required. The Agency also reasonably viewed this as an unacceptable risk given that Demand Maintenance Orders would require rapid responses from the contractor, which could be incompatible with Chugach's lower staffing levels, as less labor could complicate meeting such immediate and urgent deadlines. Lastly, the Agency reasonably determined its needs. Here, the Agency prefers more reactive maintenance from a

---

[4] The Federal Acquisition Regulation (FAR) uses the terms "responsiveness" and "non-responsiveness" in reference to sealed bids, not negotiated procurements, when requiring that bids "must" comply with the material requirements of the solicitation and that bids not in conformance with the essential requirements of the solicitation "shall" be rejected. FAR 14.301; FAR 14.404–2. However, in negotiated procurements, the FAR likewise authorizes the elimination of proposals not in conformance with the material requirements of a solicitation. *See*, *e.g.*, FAR 15.503(a)(1); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996); *Tin Mills Props., LLC v. United States*, 82 Fed. Cl. 584, 591 (2008) (holding that the agency reasonably excluded the protestor from the competitive range because the protestor's offer "materially departed from the solicitation requirements.").

large staff over a smaller staff that may reduce asset failures. Even if Chugach's plan is better, it is not the plan the Agency asked for.

Furthermore, the Agency's rating was reasonable and consistent with the terms of the Solicitation because the Solicitation stated that offerors must justify and explain their claims with sufficient detail, which Chugach did not do. Chugach did not justify or explain its plan for a reduction in staffing because it states that its reduction in Demand Maintenance Order staffing is based on its Preventative Maintenance plan creating less maintenance needs, but it does not adequately describe or explain its Preventative Maintenance plan. Rather, Chugach proposes to wait to develop a Preventative Maintenance plan until after contract award, which fails to meet the Solicitation's requirements of describing the specific assets, equipment, and schedules of a Preventative Maintenance plan.

Chugach also only vaguely states that its program, ███████, has "highly detailed business policies" that have "best practices recognized from other applicable industry segments" but it does not explain what these best practices are, how they work, or how they create efficiencies. AR 13716–18. The Solicitation explicitly warned offerors that statements such as "well know[n] techniques will be used" are unacceptable. AR 670. Chugach's language of "best practices recognized from other applicable industry segments" is very similar to "well know[n] techniques will be used," *i.e.*, what the Solicitation told offerors *not* to do. AR 13716–18; AR 670. The Agency therefore reasonably found Chugach's Technical Suitability to be vague and unsupported.

**Technical Approach Subfactor 2 (Preventative Maintenance):** Chugach argues that its "Unacceptable" rating for Subfactor 2, Preventative Maintenance, was unreasonable because the Agency deviated from the terms of the Solicitation. Pl.'s MJAR at 35. Specifically, Chugach argues that its proposal met the Solicitation requirements of a Preventative Maintenance plan because 1) its Preventative Maintenance plan was based on the Agency's asset listings; 2) it explained why its proposed reduced staffing levels were reasonable; and 3) it was informed by its partner, ████████████████. *Id.* at 35–36. The Agency argues that Chugach's "Unacceptable" rating for Subfactor 2 was reasonable because Chugach did not propose any Preventative Maintenance plan other than proposing to develop a Preventative Maintenance plan after contract award, thus not meeting the Solicitation requirements of explaining and justifying a Preventative Maintenance plan now, before award, by describing the plan's assets, equipment, and schedules, and because Chugach did not correct this issue in its final proposal. Def.'s CMJAR at 29–31.

Again, the Agency followed the terms of the Solicitation here, and Chugach did not. The Agency's rating was consistent with the terms of the Solicitation, and therefore reasonable, because the Solicitation stated that offerors receive "Unacceptable" ratings where they do not meet the requirements of the Solicitation, and that, for Subfactor 2, offerors must describe and justify their Preventative Maintenance plans' assets, equipment, and scheduling. AR 11222. Chugach did not do this and instead proposed developing a Preventative Maintenance plan *after*

contract award where it would make its own criticality determinations.  This directly contradicts the Solicitation requirements of proposing a Preventative Maintenance plan *before* contract award by describing and justifying Preventative Maintenance staffing assets and equipment, management of Preventative Maintenance Orders, and impacts on total program performance, with specific reference to the demand maintenance program.

The Agency reasonably viewed Chugach's to-be-determined Preventative Maintenance plan as an unacceptable risk because, as the Solicitation stated, offerors were required to have a plan in place for completing Subfactor 2's prescheduled Preventative Maintenance Orders as well as completing a fully operational Preventative Maintenance program within 90 days of the contract start date.  Chugach also defended its alternate post-award plan during discussions and did not change it for the final proposal.  The Agency therefore reasonably rated Chugach's Subfactor 2, Preventative Maintenance, as "Unacceptable" for not meeting the terms of the Solicitation.  AR 11222.

Lastly, because the Solicitation stated that any rating less than "Acceptable" would render a proposal ineligible for award, and because Chugach received "Marginal" and "Unacceptable" ratings, which both rank lower than "Acceptable," the Agency followed the terms of the Solicitation in not awarding the contract to Chugach.  AR 684; AR 11222; AR 14137.

### ii. The Agency Reasonably Evaluated Chugach's Price.

Agencies must meaningfully consider price when evaluating proposals.  *See Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 950–60 (Fed. Cir. 1993); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 491 (2008).  Evaluating proposals for unbalanced pricing is an example of meaningfully considering price.  *See KSC Boss Alliance, LLC v. United States*, 142 Fed. Cl. 368, 392 (2019).  "Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices," and exists where, "despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated."  FAR 15.404-1(g)(1); *see also PDS Consultants, Inc. v. United States*, 170 Fed. Cl. 107, 112–13 (2024).

Chugach argues that the Agency unreasonably evaluated its proposed price, which was balanced, because Chugach was front-loading staffing, and therefore costs, during the base year, per its Preventative Maintenance staffing plan.  Pl.'s MJAR at 17–19.  On the other hand, the Agency argues that, even if it did evaluate Chugach's proposal for unbalanced pricing unreasonably, Chugach was not prejudiced because its low ratings made it ineligible for award.  Def.'s CMJAR at 37.

The Court concludes that the Agency's evaluation was reasonable, and that, in any event, Chugach has failed to show prejudice.  The Agency's evaluation of Chugach's price was meaningful, and therefore reasonable, because the Agency reasonably found that Chugach's pricing was unbalanced without more information.  The Agency's evaluation of Chugach's

unbalanced pricing was reasonable because the FAR warns the Agency of the exact situation at issue here, where a total evaluated price appears to be acceptable, but contains prices that are "significantly over or understated." FAR 15.404-1(g)(1). Because Chugach proposed unbalanced pricing, which could have either increased its performance risk or led to unreasonably high prices, the Agency was reasonable for requiring more information for this price evaluation.

The Agency also reasonably found that Chugach's reduced staffing for its Preventative Maintenance plan, the basis for Chugach's reduced option year prices, was inadequate. The record shows that the Agency did not ignore Chugach's argument that its prices were reasonably skewed due to front-loading. *See* AR 13841; 16384. Rather, because the Agency concluded that Chugach had not sufficiently justified its plan to reduce staffing, the Agency similarly found that the reduced option year prices based on the reduced staffing were likewise inadequately justified. That is a reasonable finding, and the Agency therefore conducted a meaningful, and reasonable, price evaluation.

The Agency is also correct that Chugach was not prejudiced by any errors in the Agency's price evaluation. Because a protestor must show that it had a substantial chance of award to show prejudice, and because Chugach's ratings of "Marginal" and "Unacceptable," which rank lower than "Acceptable," render it ineligible for award, per the terms of the Solicitation, AR 684; AR 11222; AR 14137, Chugach was not eligible for award and thus not prejudiced by the Agency's price evaluation errors, if any.

## IV.     Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is hereby **DENIED**. Defendant's and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are hereby **GRANTED**. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge